[No. D003250. Fourth Dist., Div. One. Jan. 23, 1986.]

COUNTY OF SAN DIEGO et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
TRI-CITY HOSPITAL DISTRICT et al., Real Parties in Interest.

---

## COUNSEL

Lloyd M. Harmon, Jr., County Counsel, and Arlene Prater, Deputy County Counsel, for Petitioners.

No appearance for Respondent.

McDermott & Trayner, Steven L. Stern, Patrick K. Moore, Kenneth S. Bayer, Jennings, Engstrand & Henrikson and C. Michael Cowett for Real Parties in Interest.

---

## OPINION

**WORK, J.**—Petitioners, County of San Diego (County) and James A. Forde (Director of San Diego County Department of Health Services), seek prohibition to stay discovery orders of the superior court issued in response to a petition for writ of mandate brought by Tri-City Hospital District (Tri-City). Tri-City and others challenged County's failure to designate Tri-City as a level II trauma center in the County's regional plan for selection and monitoring of trauma centers, authorized by the state Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act (EMS Act), Health and Safety Code section 1797 et seq.

In superior court, Tri-City sought to discover documents connected with the review process. The County refused to produce, claiming privilege because of the alleged agreement of all parties to confidentiality, and the statutory privilege of Evidence Code sections 1040 and 1157.7. The court ordered production of records of actual deliberations of the proposal review committee (Committee), including any notes or summaries made in the course of investigation of Tri-City, and the ratings given to Tri-City by the individual Committee members. The court found that maintaining secrecy of the requested documents would impede judicial review of Tri-City's claim: ". . . it seems to me that if they [the requested documents] are not available, I don't know how I could possibly decide whether the determi-

nation by the review board was made capriciously or whether there was sufficient evidence to back it, whether there was substantial evidence, unless I know what they had." The court restricted discovery to the parties before it and ordered the records to be held confidential as to third parties and the public.

We issued the alternative writ and stayed the discovery order because petitioners claim a privilege and because of the public importance of re-solving the question whether the discovery prohibitions in Evidence Code section 1157.7 apply in the context of the trauma center designation review process. (*Sav-On Drugs, Inc.* v. *Superior Court* (1975) 15 Cal.3d 1, 5 [123 Cal.Rptr. 283, 538 P.2d 739].) For the following reasons, we conclude section 1157.7 is inapplicable here, and there is no contractual bar to dis-closing the requested materials. We hold the public interest in maintaining confidentiality of the Committee's deliberative process prohibits production of materials which would disclose the Committee's thought processes. (Evid. Code, § 1040, subd. (b)(2).) Accordingly, we issue a peremptory writ of prohibition preventing enforcement of the superior court order for production of the Committee members' informal notes, and transcripts or memoranda of their deliberations.

I

The EMS Act is intended to facilitate development and accessibility of emergency medical services. (Health & Saf. Code, § 1797.5.) It provides for local level implementation of regional trauma systems consisting of net-works of chosen trauma care facilities to which a defined class of trauma victims[1] will be transported for treatment. (Health & Saf. Code, §§ 1798.160 and 1798.169.) The local agency designated as the local emer-gency medical services agency (County, here) designates health facilities to provide the level of trauma care for which they are qualified. (Health & Saf. Code, § 1798.165.) In the designation process, the local agency must consider specified factors, including flow patterns of trauma cases, number and type of trauma cases necessary to assure that trauma facilities will pro-vide quality care, availability and qualifications of health care personnel, and related matters. (Health & Saf. Code, § 1798.161.)

As the chosen local emergency medical services agency under the EMS Act, County may designate general acute care hospitals as trauma facilities to provide levels of trauma care for which they are qualified. (Health & Saf. Code, § 1798.165.) County has designated its department of health

---

[1]In general, trauma victims are persons who suffer serious multiple body system injuries and require immediate medical attention.

services (Department) to perform the so-called proposal review process whereby hospitals may submit requests to be designated as trauma care facilities. These proposals are reviewed by a Department proposal review committee of six trauma care experts from outside San Diego County. Committee members visit each applicant facility to assess their level and quality of trauma care services. Their confidential deliberations result in an overall rating for each hospital. Each applicant then receives a score, an oral "debriefing" report at which its strengths and deficiencies are discussed, and a final written evaluation report listing deficiencies. In addition to considering the qualifications of individual hospitals, County also takes into account geographic needs throughout the region for centers, because the total number of trauma centers must be limited in order to assure that each designated facility receives enough serious trauma victims to maintain the efficiency and skills of its trauma staff members. Also, transportation times to the region's facilities must be kept in mind so that travel time from accident to facility can be minimized in most cases. In short, in selecting trauma center facilities, County must consider not only the qualifications of the facilities to provide such care but also their location and the total need for such services in the County.

## II

San Diego County's regional trauma care system began operating August 1, 1984. County created an administrative process (request for proposals (RFP)) to receive applications and review qualifications of hospitals desiring designation as trauma centers. Between December 1983 and April 1984, County designated five hospitals as trauma facilities and one children's hospital as a pediatric trauma facility, but found Tri-City and the other applicant from the north county area, Palomar/Pomerado Hospital, not qualified. All chosen hospitals were located in the south county area.

Originally, County had not intended to designate more than five trauma centers, but because all chosen facilities were in the south county, County prepared a further RFP to permit applicants in the north county another chance to qualify. This RFP specified only one applicant would be chosen (or none, if none qualified). The RFP also specifically stated, "The deliberations of the Proposal Review Committee *shall be held confidentially.* Individual detailed ratings of each Proposal may also be deemed confidential but may be made public upon appeal by an unsuccessful proposer, at the discretion of the County." (Italics added.)

The Committee evaluated Tri-City's and Palomar's new submissions through meetings with hospital staff members, review of information provided with the applications, on-site assessment of performance and capabil-

ities, and interviews with hospital staff. Committee members individually rated each facility in specific assessment categories and, after private deliberations, numerically rated and developed a list of deficiencies for each. Palomar received a score of 90.4 and Tri-City a score of 90.1; both hospitals were qualified. (A qualifying score was 70.) County voted to designate Palomar, but not Tri-City, as a level II trauma center for the contract period January 1, 1985, through April 30, 1985. Overall review of the trauma system and reconsideration of designations was then scheduled for April 1985.

## III

Tri-City's protest was dismissed without hearing for failing to list specific violations of the procedures and requirements of the RFP or specific conflicts of interest of the evaluators.

Tri-City's petition for a writ of mandate states six separate causes of action: (1) failure to hold a noticed evidentiary hearing on Tri-City's administrative appeal of the failure to designate it, in alleged violation of the procedures prescribed by the RFP; (2) wrongful refusal to disclose documents so as to permit meaningful evaluation of the review process; (3) deprivation of property rights without due process of law; (4) factual abuse of discretion in failing to designate Tri-City, in view of the demonstrated need for a trauma facility in the north county coastal area and in further view of Tri-City's being qualified for such designation; (5) and (6) unlawful monopolization and unlawful attempted monopolization destroying competition among hospitals under the Sherman Antitrust Act, United States Code section 2. Tri-City asks alternatively to be designated as a level II facility or to be provided an administrative appeal with evidentiary hearing and disclosure of pertinent documents and records connected with the trauma center designation review process.[2]

## IV

County claims immunity from discovery of the records and deliberations of the Committee, including transcripts of actual deliberations, informal

---

[2]County argues this action is moot because Tri-City was reconsidered on October 15, 1985. Because of the recurrent question of public importance of the application of Evidence Code section 1157.7 to the trauma center designation review process, we do not treat this proceeding as moot. (See, e.g., *Diamond v. Bland* (1970) 3 Cal.3d 653, 657 [91 Cal.Rptr. 501, 477 P.2d 733]; *Montalvo v. Madera Unified Sch. Dist. Bd. of Education* (1971) 21 Cal.App.3d 323, 329 [98 Cal.Rptr. 593]; *Gordon v. Justice Court* (1974) 12 Cal.3d 323, 326 fn. 1 [115 Cal.Rptr. 632, 525 P.2d 72, 71 A.L.R.3d 551].) Nor is the proceeding moot in any event as to County, which is still subject to an order of the superior court to produce documents which County claims are privileged.

notes or summaries, and the individual scores given by Committee members (as opposed to the final scores assigned by the Committee as a whole). It rests its claim on: (1) the absolute privilege against disclosure in Evidence Code section 1040, subdivision (b)(1), applying where a statute expressly forbids disclosure, and is based in turn on Evidence Code section 1157.7 which, it argues prohibits disclosure of Committee's deliberations; (2) the privacy protection afforded the deliberations of judicial and administrative bodies by the rule of *United States* v. *Morgan* (1941) 313 U.S. 409, 422 [85 L.Ed. 1429, 1435-1436, 61 S.Ct. 999], and California progeny including *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 779 [122 Cal.Rptr. 543, 537 P.2d 375]; and (3) contractual confidentiality among the parties as specifically provided in the RFP, entitled to protection under the privacy-protective rulings of such cases as *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977] and *Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516 [174 Cal.Rptr. 160].

Tri-City contends section 1157.7 does not apply, and that it needs this material to effectively have an administrative or judicial review of the designation process. It argues the *Morgan* rule is inapplicable to documents, as opposed to depositions and other "live testimony."

## V

■ County's statutory claim contends Evidence Code section 1040 "represents *the exclusive means* by which a public entity may assert a claim of governmental privilege based on the necessity for secrecy." (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 540 [113 Cal.Rptr. 897, 522 P.2d 305], quoted in *Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 123 [130 Cal.Rptr. 257, 550 P.2d 161], original italics.) The statute[3] "essentially establishes two different privileges—an absolute privilege if disclosure is forbidden by a federal or state statute (subd. (b)(1)), and a conditional priv-

---

[3]Section 1040. "(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so and;

"(1) Disclosure is forbidden by an act of the Congress of the United States or a statute of this state; or

"(2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the information be disclosed in the proceeding. In determining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered."

ilege in all other cases pursuant to which privilege attaches when the court determines, in accordance with precise statutory standards, that disclosure is against the public interest (subd. (b)(2)). (See generally comment—Assem. Com. on Judiciary.) [Fn. omitted.]" *Shepherd* v. *Superior Court, supra,* 17 Cal.3d at p. 123.) ▪ In claiming the absolute privilege, County relies on Evidence Code section 1157.7: "The prohibition relating to discovery or testimony provided in Section 1157 shall be applicable to proceedings and records of any committee established by a local governmental agency to monitor, evaluate, and report on the necessity, quality, and level of specialty health services, including, but not limited to, trauma care services, provided by a general acute care hospital which has been designated or recognized by that governmental agency as qualified to render specialty health care services. The provisions of Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code and Chapter 9 (commencing with Section 54950) of Division 2 of Title 5 of the Government Code shall not be applicable to the committee records and proceedings." [Added Stats. 1983, ch. 1237, § 1.] That statute incorporates the privilege in Evidence Code section 1157,[4] protecting proceedings and records of organized medical staff review committees responsible for the quality of in-hospital medical care from discovery (except in certain specified cases).

County argues section 1157.7 applies by its terms to the records and deliberations of Committee because it has been established "by a local governmental agency to monitor, evaluate, and report on the necessity, quality, and level of specialty health services, including, . . . trauma care services . . . ." From this premise, it argues Tri-City is not entitled to any exception to the privilege because (1) section 1157.7 does not specifically incorporate

---

[4]Section 1157. "Neither the proceedings nor the records of organized committees of medical, medical-dental, podiatric, registered dietitian, or veterinary staffs in hospitals having the responsibility of evaluation and improvement of the quality of care rendered in the hospital or medical or dental review or dental hygienist review or chiropractive review or podiatric review or registered dietitian review or veterinary review committees of local medical, dental, dental hygienist, podiatric, dietetic, veterinary, or chiropractic societies shall be subject to discovery. Except as hereinafter provided, no person in attendance at a meeting of any such committee shall be required to testify as to what transpired thereat. The prohibition relating to discovery or testimony shall not apply to the statements made by any person in attendance at such a meeting who is a party to an action or proceeding the subject matter of which was reviewed at such meeting, or to any person requesting hospital staff privileges, or in any action against an insurance carrier alleging bad faith by the carrier in refusing to accept a settlement offer within the policy limits.

"The prohibitions contained in this section shall not apply to medical, dental, dental hygienist, podiatric, dietetic, veterinary or chiropractic society committees that exceed 10 percent of the membership of the society, nor to any such committee when his or her own conduct or practice is being reviewed.

"The amendments made to this section at the 1983 portion of the 1983-84 Regular Session of the Legislature shall not exclude the discovery or use of relevant evidence in a criminal action."

the *exceptions* stated in section 1157, but refers only to "the prohibition relating to discovery or testimony provided in Section 1157," and (2) even if section 1157.7 did incorporate the exceptions of 1157, none apply to Tri-City because it does not fall within the statutory definition of a "person requesting hospital staff privileges" (the only exception stated in § 1157 which arguably applies here). On the other hand, Tri-City argues section 1157.7 entirely incorporates the privilege defined in section 1157, including any exception to the privilege there prescribed, and Tri-City contends the exception for physicians seeking staff privileges is directly analogous to, and therefore includes, a hospital seeking designation as a trauma center.

In support of its argument Tri-City introduced the declaration of Senator Paul B. Carpenter, author of the bill resulting in enactment of section 1157.7. This declaration, specifically obtained for use in the mandate action, alleges the enacting legislation (Sen. Bill No. 358) was prompted by the difficulty of the Los Angeles County Board of Supervisors in obtaining medical records of trauma patients to review ongoing professional medical practices of *existing,* designated trauma centers; the statute was enacted to specifically respond to this need by providing the necessary privacy to obtain meaningful medical quality review of trauma facilities *already in existence,* and was not intended for use in the initial designation process. The senator declares: "I did not intend, nor am I aware of any legislative intent, that SB 358 would protect records of the process of initially designating health facilities as trauma centers from discovery. Rather, SB 358 was designed to protect only the confidentiality of medical quality review of existing, designated trauma centers."

## VI

Section 1157.7 is facially ambiguous; it does not expressly state whether a committee reviewing the quality of hospital care for purposes of rating it in the designation process falls within the statutory definition of committees established to "monitor, evaluate, and report on" the "necessity, quality, and level of specialty health services, . . . including, . . . trauma care services, provided by a general acute care hospital which *has been designated* . . . as qualified to render specialty health care services." (Italics added.) The ambiguity comes from the fact that hospitals such as Tri-City are already acute care hospitals which, regardless of their designation as trauma centers, do provide some emergency care services.[5] How-

---

[5]County says Tri-City is already providing emergency medical services, operating as a "base hospital" under the EMS Act, having been designated by the County pursuant to Health and Safety Code section 1798.100 et seq. County further says these services are the "specialty health services" referred to in section 1157.7, and it is the quality of these services being reviewed to see if Tri-City is capable of caring for major trauma victims.

ever, Tri-City is not a *designated* trauma center, and the Committee review here is directed to that initial selection issue and not to ongoing evaluation or monitoring of the quality of Tri-City's trauma services in general.

The application of section 1157.7 here is sufficiently in doubt to permit the use of extrinsic aids to ascertain the legislative intent behind the statute. (See, e.g., discussion in *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698, 700 [170 Cal.Rptr. 817, 621 P.2d 856].) ■ These include statements of authoring legislators, not to show the personal beliefs of the legislator as to the meaning of the statute (which may not reflect the collective view of the enacting legislative body) but rather to cast light on the history of the measure and the arguments before the Legislature when it considered the matter. (*Id.* at p. 700; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].)

Although we therefore may consider Senator Carpenter's declaration to resolve ambiguities, that declaration does not resolve the issue. The Legislature's supposed failure to consider the review process for initial trauma center designation formally is not necessarily inconsistent with the application of the statute to both the initial and a later quality review of trauma care services. If County could show the two types of review processes were identical, bringing up for scrutiny precisely the same kinds of material, that fact would tend to support a broader concept of the legislative intent, since it would be irrational for the Legislature to limit privacy protection in so arbitrary a fashion. However, County has not submitted evidence showing such identity, although it has argumentatively asserted that initial trauma center designation and later quality review are identical procedures *in terms of the data scrutinized.* In short, neither the Carpenter declaration nor County's assertions resolve the statutory ambiguity.

■ Accordingly, we resort to the principle of statutory construction in discovery matters which requires a presumption in favor of the most liberal rights of discovery, absent compelling countervailing considerations or explicit statutory language. (See *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 377 [15 Cal.Rptr. 90, 364 P.2d 266]; *Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516 [174 Cal.Rptr. 160].) That policy is particularly compelling when discovery is sought of public records. (See *Shepherd* v. *Superior Court, supra.*) Since section 1157.7 is a statute defining a privilege and preventing discovery, it must be interpreted narrowly to achieve its special objectives. ■ Here, first, it is significant that the statute refers literally to hospitals which *have been* designated as qualified to render "specialty health care services." So far as this record shows, Tri-City, by its own allegations in the petition for mandate in the

superior court, is a general acute care hospital. We have no evidence that it has ever been designated as qualified to render specialty health care services, nor do we have any evidence as to what such services may be. Although, as stated above, County has argued that such services are simply the providing of emergency care to trauma victims, a service Tri-City presently provides, we find no authority to consider such services "*specialty*" services. They are simply standard functions of an acute general care hospital. Accordingly, it seems unjustified to extend the reach of section 1157.7 to an institution like Tri-City which is not literally a hospital "designated" to provide "specialty health care services."

County says, however, that interpreted in light of the purposes which originally caused enactment of section 1157, the newer statute was clearly intended to apply here, because the same policy applies, namely, to protect the confidentiality of patient records and to encourage full candor and uninhibited review of peer quality services.

■ Section 1157 was enacted in apparent response to a judicial decision granting discovery of the records of a hospital staff review committee (*Kenney* v. *Superior Court* (1967) 255 Cal.App.2d 106 [63 Cal.Rptr. 84]) to deny potential medical malpractice plaintiffs access to the proceedings and records of hospital medical staff committees; but the statute preserved rights of an individual doctor being denied staff privileges to have access to this information. (See discussion in *Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623, 628 et seq. [115 Cal.Rptr. 317].) The statute was a legislative choice to impede access to information by potential malpractice victims in the interests of preserving the quality of in-hospital care, which depends heavily on the frankness and candor of staff committee members in evaluating doctors with staff privileges. (*Id.* at p. 628.) In deciding precisely what committees were meant to be included within the statutory ambit, decisions focused on whether the committee in question was one that bore responsibility for the evaluation and improvement of the quality of in-hospital care. (*Id.* at p. 631.)

■ Section 1157.7 extends the privacy protection provided by section 1157 to review by a local government agency committee of the quality of specialty health care services, including trauma services. ■ ■ The only language in the statute which might arguably show concern for an initial designation procedure—as opposed to quality control review—is the use of the term "necessity," where the statute refers to the Committee's scrutiny of "the necessity, quality, and level of specialty health services, . . ." At least in theory, "necessity" could refer to the factor of regional need for trauma centers, which figures large in the process of trauma center

designation. However, except for that possibility, nothing in the statute implies any concern with the designation process.

Further, the designation process is different from ongoing quality review because the considerations are dissimilar; rather than being concerned, as an ongoing matter, with the skills and abilities of the hospital staff, the designation process focuses on county-wide needs, compares different facilities both as to services available and location, and scrutinizes patient records not from the precise focus of determining whether proper care was provided in a given case, but rather to see whether the facility has the requisite skills and experience to qualify for trauma center designation.

Further, the process of trauma center designation is basically legislative rather than adjudicatory and therefore differs from the process of peer quality review which may call in question fundamental rights of physicians holding staff privileges. (See *Santa Ana Tustin Community Hospital* v. *Board of Supervisors* (1982) 127 Cal.App.3d 644 [179 Cal.Rptr. 620] *(SATCH).*) As pointed out in *SATCH, supra,* the designation process (under an earlier statute, former Health & Saf. Code, §§ 1480-1485) does not license the hospital, control the conditions of its treatment of patients, nor otherwise impede its substantive rights to do business. It only limits its "share of the available business" through nondesignation, by causing some trauma victims to go to designated centers other than the hospital seeking designation. The significance of this difference is the lessened need for privacy in the context of the "legislative," public characterization of the designation process. ▉ Legislative activity has traditionally been presumptively available for public scrutiny. (See, e.g., *California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 213 [157 Cal.Rptr. 840, 599 P.2d 31]; *Olive Proration etc. Com.* v. *Agri. etc. Com.* (1941) 17 Cal.2d 204, 210 [109 P.2d 918]; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 589 [71 Cal.Rptr. 739].) ▉ Further, the danger of malpractice claims would seem to be substantially less in the context of a designation process than in a process of staff reviews which focus directly on the quality of physician services to patients.

Given, then, the presumption in favor of discovery (see cases cited, *supra,* we well as *Sierra Vista Hospital* v. *Superior Court* (1967) 248 Cal.App.2d 359, 365 [56 Cal.Rptr. 387]), the essential differences in the procedures of trauma center designation, on the one hand, and in-hospital staff review, on the other, and the use of the statutory language in section 1157.7 referring to a hospital which "has been designated . . . to render specialty health care services," we conclude the statute does not apply to the trauma center designation process and accordingly does not prevent access here by Tri-City to the documents it seeks. (That conclusion makes it

unnecessary to discuss the question whether, if the statute applied, the exception of section 1157 for staff physicians challenging their loss of privileges would also apply to permit the requested discovery.) Such an interpretation is consistent with the reasonable interpretation of the actual words of the statute. (See *California Teachers Assn.* v. *San Diego Community College Dist., supra,* 28 Cal.3d at p. 698; *People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1].)

## VII

 Alternatively, County argues the Committee's deliberations are protected from discovery by the *Morgan/Fairfield* rule, mentioned *supra,* 313 U.S. 409, 422; 14 Cal.3d 768, 779. That precedent mainly protects administrative officials against being questioned regarding their deliberations and motives preceding agency action. *Fairfield, supra,* discusses the problem in the context of Code of Civil Procedure section 1094.5 mandate review of administrative quasi-judicial action. In those cases, the requirement the agency state findings makes it unnecessary to delve behind the findings for evidence of the agency's actual deliberations; the full findings and administrative record provide a sufficient basis for meaningful judicial review. The *Fairfield* opinion points out that a federal exception permits examination of high level decisionmaking administrators regarding their deliberations where there is inadequate basis stated for the decision (e.g., *Citizens to Preserve Overton Park* v. *Volpe* (1971) 401 U.S. 402, 420 [28 L.Ed.2d 136, 155-156, 91 S.Ct. 814]). However, in California, the remedy is not to depose the officials but to demand findings be made.[6] (*City of Fairfield* v. *Superior Court, supra,* 14 Cal.3d at p. 779.)

Tri-City counters that in a traditional mandate proceeding, as here (Code Civ. Proc., § 1085), no findings have been made and the record is inadequate to permit review unless the requested inspection be permitted. It is true the cases we have reviewed generally have involved quasi-judicial activity. In such cases, the courts are concerned with protecting the inviolability of the deliberations of decisionmakers by preventing exploration into the reasoning and motives which might compromise the deliberative process and which are irrelevant to a review which is directed at the outcome, not the process. (See, e.g., *Governing Board* v. *Superior Court* (1985) 167 Cal.App.3d 1158 [213 Cal.Rptr. 771], hg. den. (Aug. 22, 1985); *City of Fairfield* v. *Superior Court, supra,* 14 Cal.3d at pp. 774-775; *Board of Administration* v. *Superior Court* (1975) 50 Cal.App.3d 314, 319 [123

---

[6]See also *California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d at page 212, mandate review of legislative action, requiring a formal "statement of basis" be made in accordance with statutory requirement and to permit adequate review of action, no question of privilege involved.

Cal.Rptr. 530]; *Transcentury Properties, Inc.* v. *State of California* (1974) 41 Cal.App.3d 835, 842-843 [116 Cal.Rptr. 487].) Here, however, we are concerned with the process of review as well as the outcome. We deal here with legislative activity (*SATCH, supra*), which normally should take place subject to full public scrutiny (see *Olive Proration* and *Rivera, supra*, 17 Cal.2d 204, 265 Cal.App.2d 589). Further, in its quest for review by traditional writ of mandate under Code of Civil Procedure section 1085, Tri-City must show either a purely arbitrary and capricious refusal to designate, or alternatively a procedure tainted in some way, by bias, corruption, or impermissible considerations. It will be materially hindered in its attempt to make this showing if it is denied access to the data and materials which the Committee used in making its evaluation.

We conclude the protection available for the privacy of judicial and quasi-judicial deliberations (see, e.g., our recent decision in *Arco Alaska, Inc.* v. *Superior Court* (1985) 168 Cal.App.3d 139 [214 Cal.Rptr. 51]) does not apply to the process whereby Committee here chooses to designate trauma center facilities to serve the public. The precedent does not require such a result, and the presumption in favor of discovery and in favor of public access to legislative activity argues against it.

## VIII

 County alternatively relies on the Committee members' contractual privacy expectations, based on the language of the RFP and citing the declarations of the members as to their individual expectations of privacy, and such cases as *Valley Bank of Nevada* v. *Superior Court, supra*, 15 Cal.3d 652, and *Board of Trustees* v. *Superior Court, supra*, 119 Cal.App.3d 516, which honor such private agreements to confidentiality in whole or in part. These cases, however, do not involve public agencies. As we have stated above, a public agency's exclusive claim to secrecy must rest on Evidence Code section 1040. (*Pitchess* v. *Superior Court, supra*, 11 Cal.3d 531; *Shepherd* v. *Superior Court, supra*, 17 Cal.3d 107.) Since we have determined, by finding section 1157.7 inapplicable, that the absolute statutory privilege (§ 1040, subd. (b)(1)) does not apply here, County's claim must rest on section 1040, subdivision (b)(2), the conditional privilege.

Moreover, we do not perceive the RFP's unilateral reference to confidentiality of deliberations as being the equivalent of Tri-City's having contracted to be kept in ignorance of that process. The provision is most likely to have been intended to prevent public disclosure of private hospital records, a result not contemplated here by the trial court's limited discovery order. The RFP, written by County and accordingly construed in favor of Tri-City

where ambiguous, nowhere unambiguously mandates secrecy as to the applicant.

## IX

 Although we find Tri-City is not contractually barred from obtaining disclosure of all materials considered and a revelation of all deliberations of the Committee, the fact that Tri-City filed its application in accordance with a notice plainly stating the Committee's deliberations would be held confidential, is relevant when balancing its interest in accordance with Evidence Code section 1040, subdivision (b)(2).

Here, the court must weigh the necessity for preserving confidentiality against the need for disclosure in the interest of justice. Where Tri-City has knowingly submitted its application expecting to be subject to the terms and conditions under which the call for application has been made, it must be deemed to have been agreeable to those terms. On the other hand, the County's interest in the outcome of this lawsuit is not a factor to be considered in determining the "public interest" for the purposes of section 1040, subdivision (b)(2). Here, the public's interest is that the trial court have the ability to intelligently evaluate the legal issues, to wit: whether Tri-City's application for designation as a trauma center was processed, evaluated and denied on its merits and in full compliance with applicable rules and regulations. This can be accomplished only if the raw data considered is discoverable. We are cited to no strong public interests in keeping this data confidential.

On the other hand, the public has a substantial interest in insuring that qualified professionals will not be discouraged from serving on trauma care proposal review committees. It is likely the better qualified the professionals composing the committee, the more accurate will be their evaluations of the competing hospitals. It is important to the public that the most qualified hospital be selected to provide this care even where the differences between competing hospitals may be slight and subtle. Here, the six trauma care experts utilized were not County employees. Each contracted to perform these studies and evaluations with the understanding all deliberations would remain confidential.[7] While knowledge that a professional's informal notes and recorded deliberations may become public knowledge may not deter all qualified persons from participating in this evaluation process, it unquestionably would deter some and, perhaps, most.

---

[7] However, the Committee members could not have expected their individual detailed ratings of each proposal to remain confidential because the RFP plainly states those matters may be made public at the discretion of the County.

We do not believe Tri-City has shown the interest of justice will be undercut significantly by its not receiving the Committee members' informal notes and transcripts or memoranda of the Committee's actual deliberations. However, Tri-City is entitled to review all the raw data examined by members of the Committee, their detailed findings on each proposal, the standard by which each factor was measured, and ratings as to each factor evaluated. Tri-City is not entitled to production of transcripts of the Committee members' discussions during deliberations or other memoranda of those discussions.

Let a peremptory writ of prohibition issue preventing enforcement of the trial court order for production of documents except as indicated above.

Staniforth, Acting P. J., and Wiener, J., concurred.